1

2

3

4

5

6

7                     UNITED STATES DISTRICT COURT

8               FOR THE EASTERN DISTRICT OF CALIFORNIA

9

INTERVEST MORTGAGE
10  INVESTMENT COMPANY,

11
                                NO. CIV. S-08-1543 LKK/DAD
12        Plaintiff,

13     v.
                                    O R D E R
14  KIP S. SKIDMORE and ILLA A.
    JONES-SKIDMORE, husband and
15  wife; the ALASKA TRUST
    COMPANY, et al.,
16

17        Defendants.

18  _____/

19      The origin of this suit lies in a housing development, The

20  Crest At Memory Lane.  The owner of the development, The Crest at

21  Memory Lane, LLC (CAML), sought to construct various improvements

22  of the development, and financed these improvements with a loan

23  from plaintiff Intervest.  Intervest protected this loan in two

24  ways: it was secured by real property owned by defendant CAML, and

25  defendant Skidmores signed a separate guaranty holding them

26  personally liable as guarantors on the loan.

                                  1

1    Intervest now claims that this loan is in default, and brings
2  this action claiming that Skidmores are in breach of their
3  contractual obligation to pay that guaranty.  In this suit,
4  Intervest is not seeking to recover from CAML directly.

5    The Skidmores filed a counterclaim alleging that Intervest was
6  negligent and grossly negligent in administering the loan, that
7  Intervest misrepresented and suppressed various facts, and that
8  Intervest engaged in unfair competition.  The Skidmores seek
9  damages, recision of the guaranty, and a declaratory judgment that
10 the guaranty is unenforceable.

11    In response, Intervest has filed a Fed. R. Civ. P. 12(b)(6)
12 motion to dismiss the counterclaims for failure to state a claim
13 upon which relief may be granted.  Intervest has also filed a
14 motion to attach certain real property formerly owned by the
15 Skidmores and now owned by defendant Alaska Trust Company; that
16 motion is discussed in a separate order.

17                    **I. FACTUAL BACKGROUND**

18    The facts forming the background in this case are set out in
19 this court's order on Intervest's motion to attach.  Only the facts
20 underlying Skidmores' counterclaims are provided here.

21    The loan underlying this dispute was entered into to finance
22 improvements to a multifamily condominium development in
23 Sacramento, CA, owned by CAML.  In March of 2007, Intervest and
24 CAML entered a loan agreement authorizing payment of $4.7 million.
25 This payment was not provided all at once; instead, Intervest was
26 to make disbursements to pay for particular elements of the

                              2

1 development as the project progressed.

2      This loan was protected in two ways.  First, it was secured

3 by real property owned by CAML.  That security is not relevant to

4 the counterclaims.  Second, the Skidmores provided a personal

5 guaranty for the full amount of the loan, detailed in the "guaranty

6 agreement."

7      The loan agreement specified numerous conditions that would

8 provide Intervest with the option of accelerating the loan. At

9 least two of these conditions actually occurred, the general

10 contractor lost its license in October 2007, and numerous

11 mechanics' liens were attached to the project.  The first lien was

12 in June 2007.  The total value of the liens as of August 2008 was

13 about $900,490.00.

14      The Skidmores assert that a range of Intervest's conduct was

15 wrongful, under a variety of theories.  They allegedly include:

16 1.   Intervest disbursed an additional $2,326,467 in funds after

17      the first default.  (Countercl. ¶ 10, 12, 15, 31, 72.)

18 2.   Intervest wrongly approved budget increases.  (¶ 10, 16-18,

19      31, 72.)  By approving increases after default, Intervest

20      increased the guarantor's potential liability.  Furthermore,

21      Intervest's approval of certain budget increases allegedly

22      caused the failure to renew the OCIP insurance allowing

23      increases in some construction budgets leaving insufficient

24      funds in the budget responsible for paying such fees.  (¶

25      20.)

26 3.   Intervest represented that it would comply with the terms of

3

1      the loan agreement, when in fact it knew that it would not

2      and could not have reasonably believed that it would.

3  4.     Intervest did not keep the Skidmores informed about the state

4      of the project and the loan.

5      Intervest's motion to dismiss denies that the alleged acts

6 violated the terms of the loan agreement or were otherwise

7 wrongful.  Intervest argues some acts are plainly consistent with

8 the agreement.  For the others, Intervest argues that it waived,

9 rather than violated, the relevant provisions of agreement.

10 Section 15 of the loan agreement provides that: "Lender may at any

11 time . . . waive any one or more of the conditions contained in

12 this Agreement," and does not qualify this power.

13                        **II. STANDARD**

14      In order to survive a motion to dismiss for failure to state

15 a claim, plaintiffs must allege "enough facts to state a claim to

16 relief that is plausible on its face." <u>Bell Atlantic Corp. v.</u>

17 <u>Twombly</u>, __ U.S. __, 127 S. Ct. 1955, 1974 (2007).  While a

18 complaint need not plead "detailed factual allegations," the

19 factual allegations it does include "must be enough to raise a

20 right to relief above the speculative level." <u>Id.</u> at 1964-65.

21      The Supreme Court recently held that Federal Rule of Civil

22 Procedure 8(a)(2) requires a "showing" that the plaintiff is

23 entitled to relief, "rather than a blanket assertion" of

24 entitlement to relief. <u>Id.</u> at 1965 n.3.  Though such assertions

25 may provide a defendant with the requisite "fair notice" of the

26 nature of a plaintiff's claim, the Court opined that only factual

4

1  allegations can clarify the "grounds" on which that claim rests.

2  Id. "The pleading must contain something more. . . than . . . a

3  statement of facts that merely creates a suspicion [of] a legally

4  cognizable right of action." Id. at 1965, quoting 5 C. Wright &

5  A. Miller, Federal Practice and Procedure, § 1216, pp. 235-36 (3d

6  ed. 2004).[1]

7      On a motion to dismiss, the allegations of the complaint must

8  be accepted as true. See Cruz v. Beto, 405 U.S. 319, 322 (1972).

9  The court is bound to give the plaintiff the benefit of every

10 reasonable inference to be drawn from the "well-pleaded"

11 allegations of the complaint. See Retail Clerks Int'l Ass'n v.

12 Schermerhorn, 373 U.S. 746, 753 n.6 (1963).  In general, the

13 complaint is construed favorably to the pleader. See Scheuer v.

14 Rhodes, 416 U.S. 232, 236 (1974), overruled on other grounds by

15 Harlow v. Fitzgerald, 457 U.S. 800 (1982). Nevertheless, the court

16 does not accept as true unreasonable inferences or conclusory legal

17 allegations cast in the form of factual allegations. W. Mining

18 Council v. Watt, 643 F.2d 618, 624 (9th Cir. 1981).

19                          **III. ANALYSIS**

20 **A)    Negligence and Gross Negligence Claims**

21     "The threshold element of a cause of action for negligence

22 is the existence of a duty to use due care . . . ." Paz v.

23

24     [1] The holding in Twombly explicitly abrogates the well
   established holding in Conley v. Gibson that, "a complaint should
25 not be dismissed for failure to state a claim unless it appears
   beyond doubt that the plaintiff can prove no set of facts in
   support of his claim which would entitle him to relief." 355 U.S.
26 41, 45-46 (1957); Twombly, 127 S. Ct. at 1968.

1   California, 22 Cal. 4th 550, 559 (2000).  The Skidmores' negligence

2   and gross negligence claims are based on essentially the same

3   alleged conduct, and the duty analysis for the two claims is the

4   same.  As explained below, Skidmores have not satisfied this

5   threshold issue.

6        It appears to the court that the negligence claims conflate

7   contract and tort law.  On the one hand, Skidmores contend that

8   "Intervest owes them a legal duty based upon general principles of

9   tort law separate and apart from its contractual obligations to the

10  Skidmores," i.e., "a duty to Skidmores to administer the loan in

11  a manner consistent with a reasonable bank."  (Defs.' Opp'n to Mot.

12  Dismiss at 6:12-14, 9:9.)  On the other hand, Skidmores state that

13  the relevant duty was "to administer and enforce the Loan Agreement

14  in accordance with its terms," (Countercl. ¶ 30), and that "[t]he

15  fact that Intervest did not follow the terms of the loan agreement

16  is the very negligence that constitutes the basis of Skidmores[']

17  claims."  (Defs.' Opp'n to Mot. Dismiss at 9:15-16.)

18       The second allegations cannot support a negligence claim.  "A

19  person may not ordinarily recover in tort for the breach of duties

20  that merely restate contractual obligations."  Aas v. Superior

21  Court, 24 Cal. 4th. 627, 643 (2000).  Thus, tort claims between

22  contracting parties "have been permitted [only when] . . . . the

23  duty that gives rise to tort liability is either completely

24  independent of the contract or arises from conduct which is both

25  intentional and intended to harm."  Erlich v. Menezes, 21 Cal. 4th

26

6

543, 551-52 (1999).[2]  Skidmores' negligence claims do not contend that Intervest intended harm.  Therefore, the question is whether the duty asserted by Skidmores is "completely independent of" the contracts.

Clearly, a duty to comply with a contract's terms is not independent of the contract.  Nonetheless, Skidmores also allege that there is a separate duty to act as "a reasonable bank."  Their only support for this argument is Commercial Standard Insurance Co. v. Bank of America, 57 Cal. App. 3d 241 (1976).  Commercial Standard held that a lender owed a guarantor a duty "to exercise reasonable care in the disbursement of loan proceeds in cases in which it has undertaken to disburse loan proceeds in accordance with the value of construction work performed."  Id. at 249.  However, Commercial Standard did not impose a duty that was "completely independent" of contractual obligations.  Commercial Standard involved a unique set of facts, wherein the lender and guarantor were not in a contractual relationship.  Id. at 244-45.  Cases discussing Commercial Standard have held that the lender's duty was nonetheless based on the contractual relationship of the other parties.  Fireman's Fund Ins. Co. v. Security Pacific Nat'l Bank, 85 Cal. App. 3d 797, 829 (Cal. App. 2d Dist. 1978), see also Continental Ins. Co. v. Morgan, Olmstead, Kennedy & Gardner, Inc., 83 Cal. App. 3d 593, 603 (Cal. App. 2d Dist. 1978).  This duty is

_____

[2] Later in Erlich, the Court observed that a breach of contract could also be tortious of the party knew "that such a breach will cause severe, unmitagable harm."  21 Cal. 4th at 553-54.  Skidmores have not alleged such harm or knowledge thereof.

1   ultimately rooted in contract.

2       Thus, the purported duty to act as a reasonable bank is a tort

3   duty that is <u>not</u> completely independent of the relevant contract.

4   Imposing this duty on Intervest would violate well-settled policies

5   of California contract law.  "When two parties make a contract, .

6   . . . they define their respective obligations, rewards and risks.

7   . . . [I]t is appropriate to enforce only such obligations as each

8   party voluntarily assumed, and to give him only such benefits as

9   he expected to receive." <u>Robinson Helicopter Co., Inc. v. Dana</u>

10  <u>Corp.</u>, 34 Cal. 4th 979, 992-993 (Cal. 2004) (quoting <u>Applied</u>

11  <u>Equipment Corp. v. Litton Saudi Arabia Ltd.</u>, 7 Cal. 4th 503, 517

12  (1994)).[3]

13      The court concludes that Intervest owed no independent duty

14  to the Skidmores.  Accordingly, the court does not address the

15  parties' arguments related to breach or waiver of such a duty.

16  Skidmores' counterclaims for negligence and gross negligence are

17  dismissed.

18  **B)   Negligent Misrepresentation**

19  _____

20     [3] It is important to note the limited applicability of the
    <u>Commercial Standard</u> rule.  In the thirty-two years since
21  <u>Commercial Standard</u> was decided, only three published California
    decisions have cited its statement that a lender owes a duty to a
22  guarantor, and none of these cases have imposed that duty.
    <u>Sehremelis v. Farmers & Merchs. Bank</u>, 6 Cal. App. 4th 767, 778
23  (1992), <u>Fireman's Fund Ins. Co.</u>, 85 Cal. App. 3d at 829,
    <u>Continental Ins. Co.</u>, 83 Cal. App. 3d at 603; <u>see also</u> <u>Seabord</u>
24  <u>Surety Co. v. Walker</u>, 260 Cal. Rptr 924, 927 (1989) (withdrawn
    opinion).   One Ninth Circuit opinion, decided shortly after
25  <u>Commercial Standard</u> was decided, applied the duty between non-
    contracting parties.  <u>Community Nat'l Bank v. Fidelity & Deposit</u>
26  <u>Co.</u>, 563 F.2d 1319, 1323 (9th Cir. 1977).

1    The Skidmores' negligent misrepresentation claim alleges that
2    Intervest represented "that it would adhere to the terms of the
3    Loan Agreement" when Intervest had no reasonable grounds for
4    believing that it would "properly administer the loan."
5    (Countercl. ¶¶ 37, 39.)

6    Under California law, the elements of a negligent
7    misrepresentation claim are

8       (1)   a misrepresentation of a past or existing
         material fact,
9       (2)   without reasonable grounds for believing it to
         be true,
10      (3)   with intent to induce another's reliance on
         the fact misrepresented,
11      (4)   ignorance of the truth and justifiable
         reliance thereon by the party to whom the
12            misrepresentation was directed, and
   (5)   damages.
13

14   Fox v. Pollack, 181 Cal. App. 3d 954, 962 (Cal. App. 1st Dist.
15   1986), see also Cal. Civ. C. §§ 1709, 1710.

16   Intervest argues that the Skidmores cannot satisfy the first
17   and fourth elements of a negligent misrepresentation claim.
18   Specifically, Intervest argues that if it represented that it would
19   comply with the terms of the loan agreement, this was not a
20   misrepresentation, because Intervest fully complied.  Citing
21   section 15 of the loan agreement, which authorizes Intervest to
22   waive conditions of that agreement, Intervest argues that it
23   unilaterally waived any the terms of the loan agreement that
24   Intervest's acts otherwise would have violated.  At a minimum,
25   however, Intervest violated the loan agreement's requirement that
26   "all . . . waivers . . . shall be in writing," because Intervest

9

1  did not provide written notice of its purported waivers.  Thus, if

2  Intervest represented that it intended to comply with this

3  provision, but lacked a reasonable basis for believing that it

4  would be able to do so, that would have been a misrepresentation.

5      Nonetheless, even if Intervest made such a misrepresentation,

6  the Skidmores cannot show justifiable reliance on it.  The notice

7  provision only requires the lender (Intervest) to inform the

8  borrower (CAML) of waiver.  Although a requirement that the

9  Skidmores, as guarantors, be notified of any waiver might have

10 served to inform them that the project was not proceeding according

11 to plan, and thereby spurred earlier intervention, neither the loan

12 agreement nor the guaranty state that the guarantors needed to be

13 notified of any waiver.

14     Therefore, even if Skidmores are able to show that Intervest

15 made a misrepresentation about its intent to comply with the notice

16 provision, this showing will not entitle Skidmores to any recovery

17 on a negligent misrepresentation theory.[4]

18 **C)    Suppression of Fact**

19     Under California law, a claim for suppression of fact is not

20 actionable unless the defendant had a duty to disclose the fact or

21 gave other information that was likely to be misleading due to

22 nondiscloure of the suppressed fact.  Cal. Civ. Code § 1710(3).

23 Skidmores argue that "[a] duty of disclosure [arose] from the

24

---

25     [4] Because this claim is dismissed on these grounds, the court
does not address Intervest's argument that no representations were
26 made outside of the loan and guaranty agreements.

10

1   covenant of good faith and fair dealing," relying on <u>Sumitomo Bank</u>

2   <u>of California v. Iwasaki</u>, 70 Cal.2d 81, 85 (1968), and that

3   Intervest suppressed "the deteriorating financial condition of the

4   borrower" and "the fact that Intervest did not intend to comply

5   with the terms of the Loan Agreement."

6       Skidmores' argument misreads the law, including <u>Sumitomo</u>.

7   Although the implied covenant of good faith and fair dealing

8   carries with it a duty not to "misrepresent or conceal" facts, this

9   is not the same thing as a duty requiring Intervest to

10  affirmatively disclose information. <u>Sumitomo</u>, 70 Cal. 2d. at 85.

11  <u>Sumitomo</u> did discuss some circumstances in which a creditor might

12  owe a duty to disclose information to the guarantor of a debt

13  (either before or during the relationship), but Skidmores have not

14  alleged that those circumstances exist here.  The suppression of

15  fact claim therefore fails.

16      A separate problem with the suppression claim is that some of

17  the alleged suppression occurred after the acts it is alleged to

18  have induced.  The counterclaim states that Intervest's suppression

19  induced the Skidmores to invest money and execute the guaranty.

20  (Countercl. ¶ 46.)  Even if Intervest had a duty of disclosure,

21  suppression of the deterioration of the financial condition, when

22  the deterioration occurred after execution of the guaranty

23  agreement, could not have induced Skidmores to enter the guaranty.

24  **D)   Unfair Competition**

25      Skidmores also bring a claim under California's Unfair

26  Competition Law (UCL), Cal. Bus. & Prof Code § 17200 <u>et seq.</u>.  The

1  UCL provides a cause of action for individuals who have been harmed

2  by business practices that are either "unfair" or that violate any

3  other law.   This second prong of the UCL essentially provides a

4  private right of action for violations of other laws.

5      Skidmores' UCL claim is based on an alleged violation of the

6  Federal Deposit Insurance Corporation's (FDIC) "Real Estate Lending

7  Standards," 12 C.F.R. § 365.2, and that regulation's accompanying

8  appendix.   Intervest argues that the appendix is nonbinding and

9  therefore cannot form the predicate of a UCL claim.   Intervest then

10 challenges the Skidmores' standing to bring a claim based on a

11 violation of the regulation itself, in part because Skidmores

12 cannot show that any actions harming them were caused by violations

13 of the regulation.   This court concludes that the Skidmores have

14 stated a violation of the regulation and that they have standing.

15     **1)   FDIC's Real Estate Lending Standards, 12 C.F.R. § 365.2**

16     Intervest is alleged to have violated the FDIC's "Real Estate

17 Lending Standards," 12 C.F.R. section 365.2, and their accompanying

18 guidelines, 57 Fed. Reg. 62890 (December 31, 1992) (codified at 12

19 C.F.R. Appendix A to pt 365).

20     12 C.F.R. section 365.2(a) requires FDIC insured nonmember

21 banks[5] to "adopt and maintain written policies that establish

22 appropriate limits and standards for extensions of credit that are

23 secured by liens on or interests in real estate, or that are made

24 for the purpose of financing permanent improvements to real

25

26     [5] Skidmores allege that Intervest is such a bank.

estate."  Subsection 365.2(b)(2)(iii) states in its entirety that lending policies must establish "loan administration procedures for the bank's real estate portfolio."

Thus, the requirement imposed by this section is that banks must establish "appropriate limits and standards."  The regulation does not specify what "appropriate" requires.

**2)   The Appendix to the Regulation is Unenforcable, and Cannot Be a Predicate to a UCL Claim**

The FDIC has stated that the Guidelines are not part of the regulation:

> While the guidelines are included as an appendix to the regulation, they are not part of the regulation. Therefore, when an apparent violation of Part 365 is identified, it should be listed in the Report of Examination in the same manner as other apparent violations. Conversely, when an examiner determines that an institution is not in conformance with the guidelines . . . the deficiency would not be a violation of the regulation.

FDIC's Risk Management Manual of Examination Policies, Section 3.2, Real Estate Lending Standards.  Since the appendix is not part of the regulation, it does not have the force of law.  Therefore, a violation of the guidelines cannot serve as the predicate for a claim under the UCL.

**3)   Skidmore's Standing to Bring a UCL Claim**

Intervest challenges the Skidmores' standing to bring their UCL claim.  Courts have identified three standing doctrines: constitutional (or Article III) standing, prudential standing, and statutory standing.  Constitutional standing addresses whether

13

1  plaintiff's claim satisfies Article III's jurisdictional
2  requirement of a "case or controversy." Prudential standing refers
3  to a set of non-constitutional limits imposed by federal courts.
4  Statutory standing refers to whether a plaintiff's claim is
5  authorized by the statute she seeks to invoke. As discussed below,
6  the doctrines of prudential and statutory standing overlap, and
7  Intervest's challenge to Skidmores' standing implicates this
8  intersection.

9      Skidmores clearly have constitutional standing. Pursuant to
10 Article III's case or controversy requirement, a plaintiff does not
11 present a case or controversy giving rise to federal jurisdiction
12 unless he can show injury, causation of that injury by defendants'
13 conduct, and redressability of that injury. Skidmores' injury is
14 increased liability under the guaranty (or increased risk thereof),
15 this injury was caused by Intervest's challenged disbursement of
16 funds, and this court can redress this injury through an award of
17 money damages. See, e.g., Friends of the Earth, Inc. v. Laidlaw
18 Envtl. Servs. (TOC), Inc., 528 U.S. 167, 181 (2000).

19     Turning to statutory standing, the UCL imposes explicit
20 statutory standing requirements, as amended by California
21 Proposition 64 in 2004. Specifically, the UCL imposes its own
22 injury and causation requirements: a claim can be brought "by any
23 person who has suffered injury in fact and has lost money or
24 property as a result of the unfair competition." Cal. Bus. & Prof.
25 Code § 17204. See also Californians for Disability Rights v.
26 Mervyn's, LLC, 39 Cal. 4th 223, 228 (2006).

1       Intervest's challenge to statutory standing argues that the

2 Skidmores cannot show that their injury (increased liability on the

3 guaranty)[6] is the "result of" unfair competition, because

4 (Intervest argues) Skidmores cannot show that disbursement of funds

5 was the "result of" the alleged violation of 12 C.F.R. section

6 365.2.   According to Intervest, the regulation "does not require

7 lending institutions to include any particular terms in their loan

8 agreements, does not mandate the circumstances under which

9 disbursements will be made, and does not require that loan

10 agreements be administered in particular ways."

11       This argument reads the regulation too narrowly.  Although the

12 regulation does not specify particular requirements, it does

13 require that policies be "appropriate."   The requirement of

14 appropriateness, like a requirement of reasonableness, is

15 imprecise, but not contentless, and at this stage, the court cannot

16 conclude that Skidmores will be unable to show that the policies

17 that allowed these disbursements were inappropriate.  The Skidmores

18 have sufficiently alleged that Intervest failed to adopt

19 appropriate policies; that appropriate policies would have

20 prevented Intervest from making disbursements after the lodgment

21 of the first mechanics' lien; that Intervest therefore would have

22 provided a notice of default at that time, when less money had been

23

24      [6] Although Article III and the UCL impose different injury
requirements, this distinction is not relevant here. The UCL
25 requires loss of "money or property," whereas Article III can be
satisfied by non-economic injury.  See Friends of the Earth, 528
26 U.S. at 181-82.

1  disbursed; and that Skidmores' liability on their guaranty would

2  therefore have been significantly lower.[7]   These allegations

3  satisfy the UCL's "result of" requirement.

4      Intervest also makes the separate argument that Skidmores lack

5  standing because they are not the intended beneficiaries of the

6  FDIC regulation.  Whether an individual is the intended beneficiary

7  of a statute or regulation is an aspect of the "zone of interests"

8  requirement.[8]  McMichael v. County of Napa, 709 F.2d 1268, 1273

9  (9th Cir. 1983).  This test is typically discussed as a component

10  of prudential standing.[9]

11  ────────────────

12      [7] It is unclear whether the counterclaim also alleges that
    Intervest's continued disbursements of funds were themselves a
13  violation of the FDIC regulation.

14      [8] In decisions prior to Alexander v. Sandoval, 532 U.S. 275
    (2001), courts also asked "whether the plaintiff is an intended
15  beneficiary of the statute" as part of the inquiry into whether a
    statute provided an implied right of action (itself a question
16  related to statutory standing).  Blessing v. Freestone, 520 U.S.
    329 (1997), see also Cort v. Ash, 422 U.S. 66, 78 (1975).  Here,
17  counter-plaintiff Skidmores rely on the explicit private right of
    action provided by California's UCL, so these cases discussing
18  implied rights of action, and the extent to which Sandoval
    overruled them, are not relevant in this case.

19      [9] See, e.g., Elk Grove Unified Sch. Dist. v. Newdow, 542 U.S.
    1, 12 (2004), FEC v. Akins, 524 U.S. 11, 20 (1998), Bennett v.
20  Spear, 520 U.S. 154, 163 (1997).  However, several cases have
    stated that the zone of interest test is a component of statutory
21  standing.  See Steel Co. v. Citizens for a Better Env't, 523 U.S.
    83, 97 (1998) ("[Whether] . . . plaintiff came within the 'zone of
22  interests' . . . is an issue of statutory standing."), Holmes v.
    Sec. Investor Prot. Corp., 503 U.S. 258, 287-88 (1992) (Scalia, J.,
23  concurring) (stating that statutory standing requires the two
    elements of "proximate causality" and injury within the "zone of
24  interests."), Ocean Advocates v. United States Army Corps of
    Eng'rs, 402 F.3d 846, 861 (9th Cir. 2005).  The categorization does
25  not change the analysis in this case.
        This disparity in categorization reveals the imprecision in
26  the cases that have discussed statutory standing.  The Ninth

1    Under the zone of interest requirement, the question is

2  whether the claim "fall[s] within the zone of interests protected

3  by the law invoked." Elk Grove Unified Sch. Dist. v. Newdow, 542

4  U.S. 1, 12 (2004) (quoting Allen v. Wright, 468 U.S. 737, 751

5  (1984)).  The principle underlying this requirement is that when

6  legislatures provide a right of action, they can control who can

7  enforce it, and for what purpose.  The requirement was initially

8  stated in an interpretation of section 702 of the Administrative

9  Procedures Act, which provides a cause of action to persons

10  "aggrieved by agency action within the meaning of a relevant

11  statute," and which the Court held *broadened* the ordinary scope of

12  who could state a claim.  5 U.S.C. § 702, Association of Data

13  Processing Service Organizations, Inc. v. Camp, 397 U.S. 150, 153

14  (1970).  The zone of interests requirement has since been applied

15  to non-APA claims, and its breadth "varies according to the

16  provisions of law at issue, so that what comes within the zone of

17  ─────────────────────────

18  Circuit implicitly clarified the issue when it recently stated that
    statutory standing is a type of prudential standing.  Potter v.

19  Hughes, 2008 U.S. App. LEXIS 21306, *6 (9th Cir. Oct. 10, 2008),
    see also Cetacean Cmty. v. Bush, 386 F.3d 1169, 1175 (9th Cir.

20  2004), but see Leuthner v. Blue Cross & Blue Shield of Northeastern
    Pa., 454 F.3d 120, 125 (3d Cir. 2006) (distinguishing statutory

21  standing from prudential standing).  The Ninth Circuit approach is
    consistent with the Supreme Court's frequent omission of statutory

22  standing from its discussions of standing doctrine.  "Our standing
    jurisprudence contains two strands: Article III standing, which

23  enforces the Constitution's case-or-controversy requirement, and
    prudential standing, which embodies judicially self-imposed limits

24  on the exercise of federal jurisdiction."  Newdow, 542 U.S. at
    11-12 (2004) (internal quotations and citations omitted), see also

25  Franchise Tax Bd. v. Alcan Aluminium, 493 U.S. 331, 335 (1990) ("We
    have treated standing as consisting of two related components: the

26  constitutional requirements of Article III and nonconstitutional
    prudential considerations.").

1   interests of a statute for purposes of obtaining judicial review

2   of administrative action under the generous review provisions of

3   the APA may not do so for other purposes." Bennett v. Spear, 520

4   U.S. 154, 164 (1997) (internal quotations and citations omitted).

5       Spear demonstrated that the relevant zone of interests is

6   determined by the statutory provision providing the cause of

7   action, rather than the provision sought to be enforced.  For suits

8   brought under the Endangered Species Act's citizen suit provision,

9   16 U.S.C. § 1540(g), the relevant interests are determined by the

10  purpose of that provision--which authorizes suits by "any person"--

11  and not the purpose of the substantive provision plaintiffs seek

12  to enforce.  Spear, 520 U.S. at 164-67.  Thus, the Court in Spear

13  held plaintiffs seeking to challenge, rather than promote,

14  environmental protection were within the zone of interests

15  contemplated by the citizen suit provision, even though the purpose

16  of the allegedly violated substantive provision was to protect to

17  the environment.  Id.  Similarly, for claims brought under APA §

18  702, courts look to the zone of interests protected by this

19  section.  Section 702, in turn, by its text incorporates the

20  purposes of the violated statute; that the APA itself controls is

21  demonstrated by the fact that section 702 recognizes a more

22  "generous" zone of interests than other causes of action seeking

23  to vindicate the same statute.  Spear, 520 U.S. at 164, see also

24  Association of Data Processing Service Organizations, 397 U.S. at

25  153.

26      Returning to the instant case, the relevant inquiry is

18

1   therefore whether Skidmores' claim is within the zone of interests

2   sought to be protected by California's UCL, and not whether it is

3   within the interests sought to be protected by the FDIC regulation.

4   Unlike the APA, the UCL does not refer to or incorporate the

5   purposes of the law providing the substantive standard.  Instead,

6   "[t]he UCL's purpose is to protect both consumers and competitors

7   by promoting fair competition in commercial markets for goods and

8   services."  Kasky v. Nike, Inc., 27 Cal. 4th 939, 949 (2002)

9   (citing Barquis v. Merchants Collection Assn., 7 Cal. 3d 94, 110

10  (1972)).  The UCL can make the provisions of other laws actionable

11  even when the legislature did not intend for the other law to

12  provide a private right of action.  Thus, the California Supreme

13  Court found that a private party could bring a UCL claim for

14  violation of a criminal statute prohibiting sale of tobacco to

15  minors, even though it is clear that the purpose of the statute,

16  which provided only criminal penalties, was not to provide for

17  private enforcement.  Stop Youth Addiction v. Lucky Stores, 17 Cal.

18  4th 553, 566 (Cal. 1998).  "[I]t is in enacting the UCL itself, and

19  not by virtue of particular predicate statutes, that the

20  Legislature has conferred upon private plaintiffs specific power

21  to prosecute unfair competition claims."  Id. at 562 (internal

22  quotation omitted).

23      In light of the UCL's broad purpose, the FDIC's purposes are

24  relevant only insofar as they might indicate a legislative bar to,

25  or preemption of, a UCL claim, id. at 567-68, and there is no such

26  indication here.  Therefore, as interpreted by the California

19

1   Supreme Court in <u>Stop Youth Addiction</u>, the UCL expands standing "to
2   the full extent permitted under Article III."   <u>Spear</u>, 520 U.S. at
3   165.   Although proposition 64 narrowed the UCL so that it only
4   protects economic interests, Skidmores are well within this
5   narrowed scope.   Absent preemption, the fact that the predicate
6   violation is of a federal regulation, rather than a state law, does
7   not change this analysis.

8       For the reasons stated above, the Skidmores have alleged facts
9   sufficient to plead a violation of California's UCL and to
10  establish standing to bring such a claim.

11  **E)   Rescission and Declaratory Judgment**

12      These counterclaims are derivative of Skidmores' claims for
13  misrepresentation and suppression.   Specifically, the claim for
14  rescission states that consent to the guaranty "was obtained solely
15  through misrepresentation and/or mistake."   (Countercl. ¶ 61.)
16  This claim merely repeats the allegations in the misrepresentation
17  claim, and must be dismissed for the same reasons.

18      The claim for declaratory judgment similarly seeks "a judicial
19  declaration that Counterclaimants are relieved from any and all
20  duties, responsibilities and obligations arising from same."
21  (Countercl. ¶ 67.)   Skidmores' only surviving claim, for unfair
22  competition, cannot entitle Skidmores to this remedy.   Therefore,
23  this claim must also be dismissed.

24                      **IV. CONCLUSION**

25      For the reasons stated above, Intervest's Motion to Dismiss
26  Counterclaims is:

1)   GRANTED as to Skidmores' first, second, third, fifth, sixth, and seventh counterclaims.

2)   DENIED as to Skidmores' fourth counterclaim.

3)   Plaintiff shall file an answer to the counterclaim within thirty (30) days.

IT IS SO ORDERED.

DATED:  November 24, 2008.

LAWRENCE K. KARLTON
SENIOR JUDGE
UNITED STATES DISTRICT COURT

21