UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

INTERVEST MORTGAGE
INVESTMENT COMPANY,

                              NO. CIV. S-08-1543 LKK/DAD

    Plaintiff,

  v.

                           O R D E R

KIP S. SKIDMORE and ILLA A.
JONES-SKIDMORE, husband and
wife; the ALASKA TRUST
COMPANY, et al.,

    Defendants.
_____/

    The origin of this suit lies in a housing development, The Crest At Memory Lane. The owner of the development, The Crest at Memory Lane, LLC (CAML), sought to construct various improvements of the development, and financed these improvements with a loan from plaintiff Intervest. Intervest protected this loan in two ways: it was secured by real property owned by defendant CAML, and defendant Skidmores signed a separate guaranty holding them personally liable as guarantors on the loan.

1

Intervest now states that this loan is in default, and brings this action claiming that Skidmores are in breach of their contractual obligation to pay that guaranty. Intervest is not seeking to recover from CAML directly. Before the court is Intervest's motion to attach certain real property formerly owned by the Skidmores. This property is now owned by the Alaska Trust Company, which holds the property in trusts which name the Skidmores as beneficiaries. Intervest seeks to have the transfer of these properties from the Skidmores to the Alaska Trust Company set aside as fraudulent.

Defendants Skidmores and Alaska Trust Co. argue that attachment should be denied, because attachment is inappropriate when the debt is adequately secured and because Intervest has not shown probable success on the merits of either the breach of contract or the fraudulent transfer claims.

Also before the court is Intervest's motion to dismiss defendants' counterclaims. That motion is resolved in a separate order.

**I. FACTUAL BACKGROUND**

**A) The Crest at Memory Lane**

The project underlying this dispute is an improvement to The Crest at Memory Lane, a twenty-six unit multifamily condominium development in Sacramento, California. (Compl. ¶ 22.) The Crest at Memory Lane is both the name of the development and the name of the limited-liability company that owns and is developing it (hereinafter CAML). On March 1, 2007, Intervest entered a

2

1  construction loan agreement with CAML to finance construction of
2  improvements to the development. (Compl. Ex. A (full text of the
3  loan agreement).) The total estimated cost of the project was over
4  $6,000,000. (Id. at 13.) The loan agreement authorized
5  disbursement of $4,776,000, and the remainder of the project cost
6  was to be met through equity. (Id.) As of August 26, 2008, the
7  amount owed on the loan was $3,989,517.27. (Pl.'s Mem. Supp.
8  Attachment, 3:2.)
9     Intervest protected this loan in two ways. First, CAML
10 executed a deed of trust securing the loan with the development
11 property. (Compl. Ex. A, 5.) Intervest has not provided an
12 estimate as to the value of this security. Skidmores state that
13 "[Intervest's] third party inspector estimated that the Project was
14 55% complete; Intervest's appraiser appraised the Project at
15 $7,150,000 Prospective Aggregate Retail Value As If Complete on
16 November 17, 2006." (Defs.' Opp'n at 13:1-4.) The Skidmores argue
17 that the present value of the security should therefore be treated
18 as $3,932,500. (Id.) Second, the loan is protected by a guaranty
19 executed between the Skidmores and Intervest. (Compl. Ex. B.)
20 This guaranty is discussed below.
21    Kip Skidmore is connected to CAML in at least two ways beyond
22 his role as guarantor. He is a member of CAML, and he is president
23 and owner of Sierra National Construction, a firm which was hired
24 to provide "job cost accounting services"--i.e., bookkeeping--for
25 the project. (Skidmore Decl. ¶¶ 10, 13.)
26    The parties agree that many aspects of the project have been

3

poorly administered, although they disagree as to who is to blame. Many of these problems trigger terms in the loan agreement rendering the loan immediately payable at Intervest's option. (Compl. Ex. A, 5.)  The specifics of these problems are relevant to the current dispute only in that Skidmores argue that Intervest bears responsibility for them, and that Intervest's responsibility relieves Skidmores of their obligation under the guaranty.  The problems faced by the project include the following:

- Several mechanic's liens were recorded on the property.  The first was on July 6, 2007, and eight more were recorded in December 2007.  (Skidmore Decl. ¶ 17.)  The total value of the liens recorded to date is $877,362.85.  (Defs.' Opp'n to Mot. Attach, 7:13-15.)  Under section 6(a) of the agreement, the loan becomes payable at Intervest's option if a lien is filed and CAML fails to provide a bond covering the lien "within thirty (30) days after written notice to the borrower."  (Compl. Ex. A, 5.)  No bond was ever posted, or requested by Intervest.  (Skidmore Decl. ¶ 19.)
- Sixells, the primary contractor, lost its contractor's license on October 31, 2007.  (Id. ¶ 16.)  Sixells further failed to make the equity contribution it was required to make under the loan agreement.  (Id. ¶ 30.)
- Various fees were not paid.  (Id. ¶¶ 14, 27.)  These included government fees, homeowner association reserves, trade accounts, and fees for the Owner Controlled Insurance Plan.  (Id. ¶ 22.)  Of these, the last is allegedly particularly

4

      important: the Skidmores claim that the consequent loss of this insurance, if not cured, reduces the overall value of the property by 50 percent. (Id. ¶ 26.)

- Various other aspects of the project ran overbudget. (Id. ¶ 20.) Section 7 of the loan agreement required CAML to deposit funds for unbudgeted increases. CAML did not do so, and Intervest never requested such deposits. Instead, Intervest approved unbudgeted increases of $638,479, about 22% of total budgeted loan funds for construction-related purposes. This money came from other budget and line items. (Id. ¶¶ 20, 21.)

Intervest responded to these problems by providing CAML with notice that the mechanic's liens constituted defaults, by letters dated December 19, 2007 and February 7, 2008. (Compl. ¶ 35.) On March 19, 2008, Intervest notified CAML and the Skidmores by letter that CAML was in default and that Intervest would seek to collect if the defaults were not cured within 30 days. (Id. ¶ 36.) Intervest filed this suit on July 3, 2008. The parties agree that the defaults have not been cured.

**B)  Skidmore's Guaranty on the Loan**

The guaranty on the loan was also executed on March 1, 2007. The parties agree (and the guaranty states) that Intervest would not have entered the loan agreement with CAML but for the guaranty, although the guaranty was entered as a separate instrument. (Skidmore Decl. ¶ 11, Compl. Ex. E (text of the guaranty)). The guaranty is not separately secured.

5

1    The guaranty includes a wide array of waiver provisions. For
2 example, it provides that "this Guaranty may be enforced by Lender
3 without the necessity at any time of resorting to or exhausting any
4 other security or collateral given in connection herewith or with
5 the Note, deed of Trust or any of the other loan documents," and
6 "waives any right to require Lender to join Borrower in any action
7 brought hereunder." (Compl. Ex. E, 2.) The guaranty states that
8 "Guarantor waives all rights and defenses that Guarantor may have
9 because the Loan is secured by real property," specifying that this
10 means, inter alia, that "Lender may collect from Guarantor without
11 first foreclosing on any real or personal property collateral
12 pledged by borrower." (Id. at 3-4.)
13    Finally, the guaranty imposes several obligations on the
14 Skidmores. It obliges the Skidmores "to stay adequately informed
15 . . . of any facts, events or circumstances which might in any way
16 affect Guarantor's risks hereunder," and states that the Skidmores
17 have established adequate independent means to stay so informed.
18 (Id. at 4.) The guaranty also prohibits the Skidmores from
19 transferring, encumbering, or otherwise disposing of all or
20 substantially all of their assets without Intervest's consent.
21 (Id.)
22    Intervest argues that the Skidmores possess sufficient
23 sophistication to have fully comprehended this agreement.
24 Specifically, as noted above, Kip Skidmore is president of the
25 Sierra National Construction Company. (Skidmore Decl. ¶ 13.)
26 Kip Skidmore is also a director of the Greater Sacramento Bancorp

and Chairman of the Board of its subsidiary, the Bank of Sacramento. (Second Supp. Clay Decl., 2.)

**C)    Property Intervest Seeks to Attach**

Intervest seeks to attach property worth $4,250,000. This amount is the sum of the roughly $4,000,000 it alleges is currently due on the loan and $250,000 for estimated attorney's fees. (Pl.'s Mem. Supp. Attach, 3:20-22.)

To secure this amount, Intervest seeks to attach three pieces of property: a residence in Carmichael, a residence in Hermosa Beach, and a time share in Maui. Intervest claims that Skidmore's own valuation of these properties comes to $3,244,000. (Id. at 4:13-15.)

Prior to the filing of Intervest's claim, Skidmores transferred these properties to defendant Alaska Trust Company. The transfer deeds were executed on November 28, 2007. (Orozco Decl. Exs. C, D, E.) However, the deeds were recorded in February of 2008. (Orozco Decl. Ex. F, G.) Intervest directly notified the Skidmores that the loan was in default in March of 2008, and the instant lawsuit was filed on July 3, 2008. (Skidmore Decl. ¶ 31.)

The parties have not clearly explained what proportion of the Skidmores' assets these properties constituted. Intervest alleges that the Skidmores' effective net worth declined from $31,904,015 on January 1, 2006 to $2.3 million in May 2008. (Pl.'s Reply Supp. Mot. Attach 13:1-10.) Intervest derived Skidmores' current net worth by consulting the Skidmores' May 1, 2008 financial statement and subtracting the values of assets listed as owned by various

trusts (including the properties that are the subject of this request for attachment). (Id., Orozco Decl. Ex. B.) The Skidmores dispute this calculation only by arguing that since various of the other trusts are revocable, assets in those trusts are accessible to creditors, and should not have been subtracted; however, the Skidmores do not provide alternative figures. (Defs.' Opp'n, 5:27-28.) More generally, the Skidmores claim that they are currently solvent with regard to their existing debts. (Skidmore Decl. ¶ 6.)

The Skidmores assert that their motive for transferring the property to the trusts was to facilitate succession and to minimize estate taxes. Intervest argues that the motive was to protect the property from creditors.

### E) Facts Underlying Skidmores' Affirmative Defenses and Counterclaims

These facts are more fully detailed in the court's order on Intervest's motion to dismiss Skidmores' counterclaims. In summary, Skidmores' counterclaims rely on Intervest's disbursement of funds after the various events that triggered or could have triggered default, Intervest's decision to approve various budget increases, the fact that Intervest did not affirmatively inform Skidmores about the state of the project and loan, and Intervest's alleged representations that it would comply with the terms of the agreement (whereas Skidmores allege that the other acts demonstrate noncompliance).

### II. STANDARD FOR EVALUATION OF APPLICATION FOR ATTACHMENT

A federal court applies the attachment law and procedures of

8

the state in which it sits. Fed. R. Civ. Pro. 64, <u>Reebok Int'l v. Marnatech Enters.</u>, 970 F.2d 552, 558 (9th Cir. 1992). California's attachment procedures are provided by California Code of Civil Procedure Sections 481.010 <u>et seq.</u>. Cal. C. Civ. P. § 484.090(d) states that

> The court's determinations shall be made upon the basis of the pleadings and other papers in the record; but, upon good cause shown, the court may receive and consider at the hearing additional evidence, oral or documentary, and additional points and authorities, or it may continue the hearing for the production of the additional evidence or points and authorities.

Section 484.090(d) does not provide any particular standard for interpreting or construing the evidence. However, as part of the court's inquiry into the "probable validity" of the applicant's claim, the court predicts "the probable outcome of the litigation." Section 484.090(a), <u>Loeb & Loeb v. Beverly Glen Music, Inc.</u>, 166 Cal. App. 3d 1110 (1985).

### III. ANALYSIS

**A.   Requirement for a Writ of Attachment**

The basic requirements for a writ of attachment are provided by two sections of the California Code of Civil Procedure. Section 484.090(a) states that a writ will issue if:

> (1) The claim upon which the attachment is based is one upon which an attachment may be issued.
> (2) The plaintiff has established the probable validity of the claim upon which the attachment is based.
> (3) The attachment is not sought for a purpose other than the recovery on the claim upon which the attachment is based.
> (4) The amount to be secured by the attachment is

9

1        greater than zero.

2
The Skidmores only contest whether the first two of these
3
requirements have been met.  Section 483.010 describes the types
4
of claims upon which attachment may be issued (i.e., which claims
5
satisfy section 484.090(a)(1)).  Under section 483.010(a),
6
>           Except as otherwise provided by statute, an
7           attachment may be issued only in an action on
>           a claim . . . for money, . . . based upon a
8           contract, . . . where the total amount of the
>           claim . . . [is] not less than five hundred
9           dollars ($ 500) exclusive of costs, interest
>           and attorney's fees.
10
11 Section 483.010(b) states that "An attachment may not be issued on
12 a claim which is secured by any interest in real property" unless,
13 without any act by the plaintiff, the security "has decreased in
14 value to less than the amount then owing on the claim."  Section
15 483.015 provides further requirements related to secured claims.
16      The second requirement, probable validity, is satisfied when
17 it appears to the court that "it is more likely than not that the
18 plaintiff will obtain a judgment against the defendant on that
19 claim."    Cal. C. Civ. Proc. § 481.190.    "In making this
20 determination, a court must review the evidence before it and
21 'consider the relative merits of the positions of the respective
22 parties and make a determination of the probable outcome of the
23 litigation.'" Prometrix Corp. v. Sierra Nev. Gaming, Inc., 2005
24 U.S. Dist. LEXIS 23863 (E.D. Cal. Oct. 17, 2005) (quoting Loeb &
25 Loeb v. Beverly Glen Music, Inc., 166 Cal. App. 3d 1110 (1985)).
26 See also Amalgamated Bank, 149 Cal. App. 4th 1003 (applying the

same test for attachment, but relying on § 405.3).

**B.    Whether Attachment May Issue Upon the Claim**

The Skidmores do not dispute that, but for the security, the guaranty satisfies the requirements of section 483.010, and that the claim is otherwise the type of claim upon which attachment may be issued.  Skidmores' argument is that, pursuant to California Civil Code section 2809, Intervest cannot seek attachment against the guarantor unless it could also proceed against the debtor, and that pursuant to Cal. Civ. Pro. Code sections 483.010(b) and 483.015(b)(4), attachment is not available against CAML because the obligation is secured.  Intervest's primary response is that the guaranty agreement explicitly waives the Skidmores' rights under those statutory provisions.

Under section 2809, the obligation of a surety cannot be greater than the obligation of a principal debtor.  Civil Code section 2787 abolished the distinction between sureties and guarantors, and stated that the terms may be substituted for one another "in any law of [California] now in force or hereafter enacted."  Applying these provisions, one California Appellate Court stated, in dicta, that "when a secured creditor proceeds against a [guarantor] on a [guaranty] he may be required first to exhaust his security, and he may be prevented from attaching property of the [guaranty] as long as his security retains sufficient value to cover the amount of his claim."  FNB Financial Co. v. Superior Court, 80 Cal. App. 3d 927, 930 (Cal. App. 2d Dist. 1978).

11

However, the guaranty agreement waived Skidmores' rights under section 2809.[1] This section has explicitly been held to be waivable. <u>Bloom v. Bender</u>, 48 Cal. 2d 793, 804 (1957), <u>River Bank v. Diller</u>, 38 Cal. App. 4th 1400, 1419 (1996). Similarly, section 2849, which specifically provides that guarantors are entitled to the benefit of securities held by debtors, is also waivable. <u>American Guaranty Corp. v. Stoody</u>, 230 Cal. App. 2d 390, 396 (Cal. App. 2d Dist. 1964) ("Here the guarantor waives his right under section 2849 to the benefit of the security given by the principal obligor. We can see no policy reason why a guarantor should not be permitted, by contract, to waive his entitlement to this benefit.").

Having determined that the relevant statutory protection is waivable, the court evaluates whether there was an adequate waiver in this case. Under California law,

> Waiver always rests upon intent. Waiver is the intentional relinquishment of a known right after knowledge of the facts. The burden, moreover, is on the party claiming a waiver of a right to prove it by clear and convincing evidence that does not leave the matter to speculation, and doubtful cases will be decided against a waiver.

<u>Drg/Beverly Hills Ltd. v Chopstix Dim Sum Café and Takeout III, Ltd.</u>, 30 Cal. App. 4th 54, 60 (1994) (internal citations and quotations omitted). Here, the guaranty agreement states that the

---

[1] Because the court concludes that the waiver argument is successful, the court does not address Intervest's other arguments that section 2809 should not apply.

12

1  guaranty "may be enforced by the Lender without the necessity at
2  any time of resorting to or exhausting any other security or
3  collateral . . . ."  (Compl. Ex. E, 1.)  This statement
4  specifically identifies the right to have the lender foreclose on
5  the security prior to seeking other remedies, and explicitly waives
6  that right.  Similarly, the guaranty "waives any right to require
7  Lender to join Borrower in any action brought hereunder or to . .
8  . obtain any judgment against Borrower."  (<u>Id.</u>)  This statement
9  specifically identified the right under Cal. Civ. Code § 2809 and
10 waives that right.  Finally, the guaranty specifies that the
11 "Guarantor waives all rights and defenses that the guarantor may
12 have because the Loan is secured by real property.  This means,
13 among other things: (1) Lender may collect from Guarantor without
14 first foreclosing on any real or personal property collateral
15 pledged by Borrower."  (Compl. Ex. E, 3-4.)

16      Skidmores argue that attachment is nonetheless inappropriate,
17 because none of these waivers specifically identify the right not
18 to have property attached.  Skidmores misstate the effect of Cal.
19 Civ. Pro. Code §§ 483.010(b) and 483.015(b)(4).  These sections
20 provide that the amount that may be attached is limited to the
21 amount of the debtor's unsecured potential liability.  Skidmores
22 explicitly and clearly waived any reliance on the loan's security.
23 Therefore, the guaranty agreement was entirely unsecured, and there
24 was no right against attachment to be waived.[2]  Waiver of Civil

---

[2] In light of this conclusion, the court also does not address whether sections 483.010 and 483.015 are waivable. Similarly, the

13

Code section 2809, which would have allowed Skidmores to rely on CAML's security, is not made ineffective by the fact that the waiver did not identify every consequence of that waiver.

**C.    Probable Validity**

An application for attachment also requires Intervest to show the probable validity of its breach of contract claim and its fraudulent transfer claim.

**1.    Breach of the Guaranty Agreement**

Intervest has shown that the Skidmores entered a seemingly valid contract guaranteeing the loan to CAML, that the loan to CAML is in default, and that the Skidmores have not paid under this guaranty.  The Skidmores challenge the validity of the contract, and raise numerous affirmative defenses and counterclaims.

Intervest argues that it may not be required to refute these defenses, i.e., that probable validity on the prima facie case may be sufficient.  The court disagrees.  Section 484.090 requires prediction of the probable outcome of the litigation, and the affirmative defenses and counterclaims will potentially influence this outcome.

Nonetheless, as noted in this court's separate order, all but one of Skidmores' counterclaims fail to state a claim upon which

---

court does not address Skidmores' argument that purported waiver of these sections did not satisfy the requirements of <u>Cathay Bank v. Lee</u>, 14 Cal. App. 4th 1533, 1539 (1993), except to note that <u>River Bank Am.</u>, 38 Cal. App. 4th at 1418-19, narrowly construed <u>Cathay Bank</u> as inapplicable to waiver of Civil Code § 2809, and further noted that even what remained of the case after this construction had "arguably been eroded by the recently enacted legislation."

14

relief may be granted.  The remaining claim, for unfair competition, faces the significant hurdle of showing that an "appropriate" lending policy would have prevented Intervest from making some of the disbursements.  Evaluating the likely outcome of this claim, as this court must, indicates that it is more likely than not that this claim will not reduce Intervest's recovery.

Evaluation of the affirmative defenses that are not also packaged as counterclaims poses a challenge for the court. Defendants assert that these defenses show the probable invalidity of Intervest's claim, but defendants have provided no discussion of the merits of these defenses.  Faced with this relative silence, the court declines to predict how these defenses will be argued, or their likely efficacy.  The affirmative defenses that have not been argued therefore do not change the court's evaluation of the likely outcome of this case.

Therefore, Intervest has demonstrated that it is more likely than not that it will succeed on the breach of contract claim if the matter is fully litigated, thereby demonstrating the probable validity of this claim.

### 2.  **Fraudulent Transfer**

California Civil Code section 3439.04(a) provides two ways in which a transfer can be fraudulent. Subsection (a)(1) prohibits transfers made with actual intent to hinder, delay, or defraud a creditor.  Subsection (a)(2) prohibits transfers made without reasonably equivalent exchange and value, where the debtor either

(A)  Was engaged or was about to engage in a

15

          business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction. [or]
(B) Intended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due.

Subsections (a)(1) and (a)(2) establish alternatives; therefore, a creditor proceeding under (a)(2) does not need to establish actual intent. Lyons v. Security Pacific Bank, 40 Cal. App. 4th 1001 (1995).[3] The court finds that Intervest has established probable validity of its fraudulent transfer claim under section 3439.04(a)(2)(A), and does not consider the other theories.

    As a preliminary, the California's fraudulent transfer provisions specifically provide that if a creditor may "obtain . . . [a]n attachment or other provisional remedy against the asset transferred." Cal. Civ. C. § 3439.07.

    The Skidmores concede that the transfer to the Alaska Trust Company was made as a gift and without reasonably equivalent exchange and value.

---

[3] Intervest argues that section 3439.10 states that the principles of equity further supplement 3439.04(a), and that a balancing of the equities favors allowing attachment. Section 3439.10 states, in its entirety, that:
    Unless displaced by the provisions of this chapter, the principles of law and equity, including the law merchant and the law relating to principal and agent, estoppel, laches, fraud, misrepresentation, duress, coercion, mistake, insolvency, or other validating or invalidating cause, supplement its provisions.
This section is not a general invitation to balance the equities beyond the traditional doctrines, and is not applicable here.

16

Intervest alleges that this transfer left the Skidmores with assets that were unreasonably small in light of the businesses and transactions they were engaged in.  The burden of showing insolvency is on the creditor.  Neumeyer v. Crown Funding Corp., 56 Cal. App. 3d 178, 186 (Cal. App. 1st Dist. 1976), dissapproved on other grounds by Liodas v. Sahadi, 19 Cal. 3d 278, 287 (Cal. 1977). However, Intervest has shown that it will probably satisfy this burden.  The Skidmores were engaged in a transaction requiring them to guaranty the loan to CAML, and as discussed above, the Skidmores agreed to do so without reliance on CAML's security. Therefore, the "reasonable" assets required under section 3439.04(a)(2)(A) would need to be sufficient to satisfy this guaranty.  The evidence available at this point in litigation-- Intervest's estimate of the Skidmores' available assets as being less than the amount of the guaranty, the other claims against the Skidmores (albeit of unknown merit and magnitude), and the Skidmores' failure to provide a competing accounting of their assests and potential liability under these transactions (and not merely under existing debts)--satisfies Intervest's burden to show that it is more likely than not that it will prevail on the fraudulent transfer claim.

## IV. CONCLUSION

For the reasons stated above, plaintiff Intervest's motion for right to attach is GRANTED.

IT IS SO ORDERED.

DATED: December 18, 2008.

LAWRENCE K. KARLTON
SENIOR JUDGE
UNITED STATES DISTRICT COURT