UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

INTERVEST MORTGAGE
INVESTMENT COMPANY,

                        NO. CIV. S-08-1543 LKK/DAD

        Plaintiff,

   v.

                        O R D E R

KIP S. SKIDMORE and ILLA A.
JONES-SKIDMORE, husband and
wife; the ALASKA TRUST
COMPANY, et al.,

        Defendants.

_____/

    Plaintiff Intervest-Mortgage Investment Co. ("Intervest") issued a loan to finance construction of a housing project, and protected this loan by, inter alia, acquiring an unsecured personal guaranty from defendants Kip Skidmore and Illa Jones-Skidmore. This loan is in default, and Intervest has sought to collect on the guaranty. Intervest claims that Skidmores have breached the guaranty contract, and that Skidmores fraudulently transferred certain assets in order to escape this obligation. Pending before

1

the court is Intervest's motion for partial summary judgment as to liability on both claims.

## I. BACKGROUND[1]

### A. The Guaranty Agreement

Intervest entered a loan agreement with the Crest at Memory Lane, LLC ("CAML") on March 1, 2007 to finance a development project. The loan was for $4,776,000. That same day, the Skidmores executed a personal guaranty, agreeing to pay all sums due on the loan in the event of a borrower default. The Skidmores were also involved in the project in other ways. Kip Skidmore is involved in the CAML LLC, and he is president and owner of Sierra National Construction, a firm which was hired to provide "job cost accounting services"--i.e., bookkeeping--for the project. In addition, the Skidmores have directly invested $55,000 of their own funds in the project, separate from their membership in CAML.

The loan is presently in default. The loan agreement provides that the loan amount "shall become due and payable at the option of [Intervest]" when, among other possible reasons, a lien is filed against the property and the lien is not correcting within 30 days after written notice to CAML. Numerous mechanics' liens were recorded against the property, the first in July 2007. On December

---

[1] Intervest objects to the purported expert testimony offered by Skidmores' declarant Nick Kalanges. To the extent that Kalanges offers legal conclusions regarding compliance with California's Uniform Fraudulent Transfer Act, this testimony is excluded. The court does not rely on Kalanges' testimony concerning property values, because other evidence in the record, when interpreted in the light most favorable to Skidmores, leads the court to the same valuation.

2

19, 2007 and again on February 7, 2008, Intervest gave written notice to CAML that such liens had been recorded, and that these constituted defaults on the loan agreement.

As is typical with construction loans, the full loan amount was not initially disbursed. Instead, Intervest made regular disbursements beginning in March 2007. Intervest asserts that the amount currently due on the loan is $3,402,123.17, and seeks to collect this amount.

**B.   The Allegedly Fraudulent Transfers**

Skidmores executed the first of the deeds for the allegedly fraudulent transfers on November 28, 2007. These deeds transferred a condominium in Hermosa Beach, California, various real property in Sacramento, California, and a time share in Hawaii to the Alaska Trust Company. Skidmores received no money in exchange for these transfers. Skidmores contend that these transfers were performed for estate planning and estate tax purposes.

Intervest seeks summary judgment on the ground that these transfers left the Skidmores with assets that were "unreasonably small in relation to the business" they were engaged in. Cal. Civ. Code § 3439.04(a)(2)(A). Intervest bases this argument on an evaluation of Skidmores' assets and outstanding liabilities, as indicated by financial statements provided by the Skidmores. The parties do not dispute the nature of these assets and liabilities--i.e., what the Skidmores own and what transactions they have entered into--except for the valuation of certain real estate assets. The parties vigorously dispute, however, the legal

significance of these facts.  Skidmores' particular debts and assets are discussed below.

## II. STANDARD FOR A MOTION FOR SUMMARY JUDGMENT

Summary judgment is appropriate when it is demonstrated that there exists no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144, 157 (1970); <u>Poller v. Columbia Broadcast System</u>, 368 U.S. 464, 467 (1962); <u>Jung v. FMC Corp.</u>, 755 F.2d 708, 710 (9th Cir. 1985); <u>Loehr v. Ventura County Community College Dist.</u>, 743 F.2d 1310, 1313 (9th Cir. 1984).

Under summary judgment practice, the moving party

> [A]lways bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

<u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).  "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'"  <u>Id</u>.  Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at

4

trial. Id. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." Id. at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); First Nat'l Bank of Arizona v. Cities Serv. Co., 391 U.S. 253, 288-89 (1968); Ruffin v. County of Los Angeles, 607 F.2d 1276, 1280 (9th Cir. 1979), cert. denied, 455 U.S. 951 (1980).

In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. Rule 56(e); Matsushita, 475 U.S. at 586 n.11; First Nat'l Bank, 391 U.S. at 289; Strong v. France, 474 F.2d 747, 749 (9th Cir. 1973). The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable

jury could return a verdict for the nonmoving party, Anderson, 242 U.S. 248-49; Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." First Nat'l Bank, 391 U.S. at 290; T.W. Elec. Serv., 809 F.2d at 631. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments); International Union of Bricklayers v. Martin Jaska, Inc., 752 F.2d 1401, 1405 (9th Cir. 1985).

In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. Rule 56(c); Poller, 368 U.S. at 468; SEC v. Seaboard Corp., 677 F.2d 1301, 1305-06 (9th Cir. 1982). The evidence of the opposing party is to be believed, Anderson, 477 U.S. at 255, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party, Matsushita, 475 U.S. at 587 (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) (per curiam)); Abramson v. University of Hawaii, 594 F.2d 202, 208 (9th Cir. 1979). Nevertheless, inferences are not drawn

out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987).

Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 587 (citation omitted).

### III. ANALYSIS

**A.  Breach of Contract**

As to the breach of contract claim, only a single issue is in dispute. Skidmores argue that Intervest's conduct relating to the loan violated the FDIC's safety and soundness regulation codified at 12 C.F.R. § 365.2. Skidmores brought a counterclaim under the California's Unfair Competition Law predicated upon this alleged violation, and argue that success on this counterclaim would entitle them to an injunction against enforcement of the contract. In a separate order, this court concludes that Skidmores lack standing to bring this UCL claim. Accordingly, this argument fails. Skidmores' attempt to package this argument as an affirmative defense, arguing that Intervest's damages were caused by conduct that violated these laws, fares no better.

Aside from these arguments, Skidmores do not dispute the evidence offered by Intervest to establish the elements of a claim

for breach of contract.  Accordingly, Intervest's motion for partial summary judgment is granted on this claim.

**B.  Fraudulent Transfer**

Intervest's complaint alleges that the transfer of various assets to various trusts were prohibited by Section 3439.04 of the California Uniform Fraudulent Transfer Act, California Civil Code section 3439 et seq.[2]  Section 3439.04 provides two alternative ways in which a transfer can be fraudulent.  Subsection (a)(1) prohibits transfers made with actual intent to defraud or hinder a creditor.  Subsection (a)(2) prohibits transfers made without receiving "reasonably equivalent value" in exchange, where the debtor also either

> (A) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction. [or]
>
> (B) Intended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due.

Under subsections (a)(1) and (a)(2), a transfer may be fraudulent as to a creditor regardless of "whether the creditor's claim arose before or after the transfer was made."  § 3439.04(a). Although Intervest has not abandoned its claim that the transfer was intentionally fraudulent in violation of subsection (a)(1), the

---

[2] The California Uniform Fraudulent Transfer Act is modeled on Uniform Fraudulent Transfer Act drafted by the National Conference of Commissioners on Uniform State Laws, although the California legislature did not adopt the model statute in full. Most states have adopted versions of this uniform act.

8

present motion seeks partial summary judgment only as to whether the transfers were fraudulent within the meaning of subsection (a)(2)(A).

The parties do not dispute that the Skidmores did not receive a "reasonably equivalent value" for the transferred properties, or that they were engaged in and about to engage in business or a transaction, including the guaranty with Intervest. Therefore, the only issue is whether the Skidmores' "remaining assets . . . were unreasonably small in relation to the . . . business." Cal. Civ. Code § 3439.04(a)(2)(A).

### 1. The Meaning of Unreasonably Small Assets

The determination as to whether assets are unreasonably small in light of the transferor's business or a transaction must be made based on information available at the time of the transfer. Nasr v. Geary, 2003 U.S. Dist. LEXIS 13887, *64 (C.D. Cal. June 9, 2003) (citing Duke Salisbury v. Texas Commerce Bank, N.A. (In re WCC Holding Corp.), 171 B.R. 972, 985 (Bankr. N.D. Tex. 1994)). Thus, the issue whether Skidmores' assets in November of 2007 were sufficient.[3]

---

[3] Intervest initially supported its motion only with evidence of Skidmores' financial condition in May 2008, rather than evidence directly speaking to November 2007. In Intervest's reply memorandum, Intervest argues that even if Skidmores' evidence regarding their financial condition in November 2007 is used, Skidmores' post-transfer assets were unreasonably small.

Skidmores argue that Intervest's initial failure to provide direct evidence of Skidmores' November 2007 financial condition is an independent ground for denial of this motion. The court disagrees; although the May 2008 financial figures were not the best evidence of Skidmores' November 2007 financial condition, they were some evidence of this, satisfying Intervest's initial burden

The Uniform Fraudulent Transfer Act does not define what it means to have unreasonably small assets.  Courts applying the statute have "weigh[ed] the raw financial data of the balance sheet against the nature of the entity and its need for capital over time," or have evaluated the "debtor's future ability to generate cash and pay its debts as they come due."  In re Still, 393 B.R. at 919 (quoting Pajaro Dunes, 174 B.R. at 591); see also Nasr, 2003 U.S. Dist. LEXIS 13887.

In addition to these standards, Intervest argues that a debtor's assets are unreasonably small if they leave the debtor insolvent within the meaning of the UFTA.  However, insolvency cannot constitute unreasonably small assets per se.  Under the UFTA, an entity is insolvent "if, at fair valuations, the sum of the debtor's debts is greater than all of the debtor's assets."  Cal. Civ. Code § 3439.02(a).  A "debt" is a liability on a claim, and a "'claim' means a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured."  § 3439.01(b), (d).[4]  Thus, while the unreasonably small assets test roughly measures assets against debts as the debts become due, the insolvency test measures

---

on a motion for summary judgment.

[4] The Act effectively leaves some secured obligations out of the insolvency calculation: property is not an "asset" to the extent that it is encumbered as security for an obligation, but for purposes of determining insolvency, debts owed by the transferor that are secured by property that is not an asset are not considered.  §§ 3439.01(a)(2), 3439.02(e).

10

assets against the combined total of debts that are due and not yet due.  In some cases, assets may be sufficient under the former test while being insufficient under the latter.  For example, a debtor may have debts that it knows will be paid over a period of time, such that a debtor need not maintain assets sufficient to satisfy the debt immediately.

A second reason why insolvency, as defined by the UFTA, cannot constitute unreasonably small assets per se is that the UFTA includes a separate provision concerning when transfers which leave a debtor insolvent are fraudulent.  This section provides that

> A transfer made . . . by a debtor is fraudulent **as to a creditor whose claim arose before the transfer was made** . . . if the debtor made the transfer . . . without receiving a reasonably equivalent value in exchange . . . and the debtor was insolvent at that time or the debtor became insolvent as a result . . . .

Cal. Civ. Code § 3439.05 (emphasis added).  This section therefore includes a time limit not found in section 3429.04, which applies "whether the creditor's claim arose before or after the transfer was made."  If a transfer that made the debtor insolvent also necessarily left the debtor with unreasonably small assets, section 3439.05's limit to claims arising before the transfer, a limit that does not appear in section 3439.04, would be meaningless.

Although several courts discussing the California statute have, in surveying cases, stated that one view is that insolvency shows unreasonableness, this court is not aware of any decision that actually applied this interpretation to the California

11

statute. See Pajaro Dunes Rental Agency v. Spitters, 174 B.R. 557, 591 (Bankr. N.D. Cal. 1994) (stating that some courts had adopted this position, but citing cases that were both from other jurisdictions and decided prior to the drafting of the model UFTA); see also Still v. Arakelyan (In re Still), 393 B.R. 896, 919 (Bankr. C.D. Cal. 2008) (quoting Pajaro Dunes for the proposition that some courts use this interpretation).

Thus, a transfer leaves a debtor with assets that are "unreasonably small in relation to [the debtor's] business or transaction" if the assets are not reasonably likely to meet the debtors' present and future needs. This inquiry is obviously related to whether the assets exceed the total of the debtor's existing and potential liabilities. However, a debtor's assets may be reasonable in light a debtor's business even when they leave the debtor insolvent.

**2.   Skidmores' Assets**

Having discussed the interpretation of "unreasonably small," the court then turns to the task of identifying Skidmores' assets. Skidmores argue that their November 2007 financial statement, which was prepared prior to the transfers, indicates that Skidmores owned cash, real estate, stocks, bonds, various retirement plans, and various other property collectively worth "in excess of $24,000,000." Skidmores' Disputed Fact 40. Skidmores then argue that at the time of the transfer, the transferred properties had a value of $7.6 million. Thus, Skidmores argue that after the transfer, they held assets worth $16.4 million. Although Intervest

disputes Skidmores' valuation of these properties, Skidmores have provided evidence that would enable a trier of fact to conclude that Skidmores' values are correct.

Intervest also argues that the UFTA's definition of "assets" causes certain properties to be excluded from this calculation as a matter of law. Cal. Civ. Code § 3439.01(a) provides that

> "asset" means property of a debtor, but the term does not include, the following:
>
> (1) Property to the extent it is encumbered by a valid lien.
>
> (2) Property to the extent it is generally exempt under nonbankruptcy law.
>
> (3) [ . . . ]

Here, both subsections (1) and (2) operate to exclude some of the properties that Skidmores' included in the above calculation.

First, Intervest argues that shares of stock owned by the Skidmores are not an asset because they been pledged as security for a line of credit. Pledging stocks in this way imposes a lien within the meaning of the UFTA, which defines a lien as "an interest in property to secure payment of a debt or performance of an obligation." § 3439.01(f); see also Hartford v. State Bar, 50 Cal. 3d 1139, 1153 n.11 (1990). Thus, the pledge of this stock implicates § 3439.01(a)(1). The available evidence indicates that Skidmores pledged property worth $4,188,885 in this manner.[5]

---

[5] Skidmores' opposition and accompanying submissions, despite repeatedly emphasizing the importance of looking to November 2007 rather than May 2008 in evaluating assets held, do not discuss whether this line of credit and accompanying pledge existed at the earlier time. The available evidence indicates that the pledge

13

However, property is excluded from the calculation of assets only "to the extent it is encumbered." Id. Neither party has directly addressed how much had been drawn on this line of credit in November of 2007. Kip Skidmore's declaration states that as of May 2008, the balance of this line of credit was $147,190. A notation for this amount appears on the May 2008 financial statement. The corresponding line on the November 2007 financial statement provides a value of $150,000. Accordingly, the available evidence indicates that in November 2007, the extent of the encumbrance on the pledged stock was $150,000. Accordingly, the Skidmores' claimed assets must be reduced by $150,000.

Second, some of Skidmores' properties are "generally exempt under nonbankruptcy law." According to the California Legislative Committee Comment, "[n]onbankruptcy law is the law of a state or federal law that is not part of the Bankruptcy Code." Cal. Civ. Code § 3439.01, Legislative Committee Comment 1986 § 1. Thus, the California Code of Civil Procedure provisions concerning property that is exempt from being sought in the enforcement of monetary judgments is nonbankruptcy law. Cal. Code Civ. P. § 704.115(b)

---

existed in November 2007, because that financial statement includes a line item for the amount owed on the line of credit. As to the value of the stocks pledged, Skidmore states that he has "pledged the stocks whose value shows as $814,859 on my May 1 [2008] financial statement." Skidmore Decl. ¶ 14. The May 2008 financial statement includes a line for "Stocks and Bonds" valued at $814,859. Thus, it appears that all stocks and bonds owned in May 2008 were pledged. The corresponding line for the November 2007 financial statement indicates a value of $4,188,885. Therefore, the only evidence indicates that the full value of these stocks was pledged in November 2007.

14

exempts "[a]ll amounts held, controlled, or in process of distribution by a private retirement plan." The Skidmores' share in the "Sierra National Construction Profit Sharing Plan," which they value at $641,101 in their calculation, is therefore excluded. Similarly, Skidmores' two IRAs, worth $12,478 and $30,991 in the Skidmores' calculation, are rendered exempt by Cal. Code Civ. P. § 704.115(a)(3). Thus, Skidmores' calculation of their assets must be further reduced by $684,570.

Subtracting these two figures from the total value of the property held by Skidmores after the transfer, and interpreting the available evidence in the light most favorable to Skidmores, Skidmores' assets after the transfer were worth approximately $15.6 million.

### 3. Skidmores' Business Activities

The statutory inquiry is whether the transferor "was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction." Cal. Civ. Code § 3439.04(a)(2)(A). The undisputed evidence establishes that Kip Skidmore was engaged in the business of construction and real estate development, and in particular, of guaranteeing construction loans. Accordingly, the sufficiency of the Skidmores' assets must be judged in relation to this broader business, and not solely the transaction with Intervest.

As stated above, although the reasonableness of assets does not turn solely on insolvency, courts nonetheless use a "balance

15

sheet" approach to evaluating reasonableness. In re Still, 393 B.R. at 919. The court must determine whether the remaining assets left the Skidmores reasonably able to pay obligations that they should have expected to arise out of their business. Intervest argues that two factors indicate that Skidmores' assets fail this test.

First, Intervest argues that Skidmores must have reasonably expected that their assets would decline in value. Skidmores' financial statements, interpreted in the light most favorable to Skidmores, indicate that Skidmores' total assets (including the transferred assets) significantly declined in value from $32,141,148 to $24,500,000, or by over 20 percent, in the ten months between the January and November 2007 statements. Defs.' Undisputed Fact 36, 43. Relatedly, the market value Skidmores' real estate holdings, which constituted the bulk of Skidmores' assets, had already began to decline between January and November 2007. Based on these facts, Skidmores could have reasonably expected that their assets would further decline in value. However, in evaluating the present motion, the undisputed evidence does not determine how much of a decline the Skidmores should have expected. The actual subsequent decline, according to Skidmores, was from approximately $16.7 million immediately after the transfer in November 2007 to $4,859,290 on May 2, 2008, a dramatically greater drop. Skidmore Decl., p. 5-6.

Second, Intervest argues that Skidmores' assets were unreasonably small in light of Skidmores' contingent debts and

16

business obligations. The guaranty on the loan from Intervest is for $4.75 million. At the time of the transfer, several facts should have put Skidmores on notice that they may be required to actually pay on this guaranty. The first lien on the project was recorded in July 2007, the project's primary contractor lost its license in October 2007, and various fees in connection with the project had not been paid. Apart from any independent obligation Skidmores may have had to investigate their likelihood of needing to pay on the guaranty, Kip Skidmore's position as a member of CAML, the LLC overseeing the project, and as president and owner of Sierra National Construction, a firm which was hired to provide "job cost accounting services"--i.e., bookkeeping--for the project, should have caused at least some of these facts to be known to him. See Order of December 19, 2009 (citing Declaration of Kip Skidmore).

Beyond the guaranty on Intervest's loan, Skidmores provided similar guaranties on at least three other loans in which the lender has subsequently filed suit seeking to collect on the guaranty. Plainitffs in these suits, the limit on the guaranty, and the date the guaranty was entered are

1. Umpqua Bank, $4.25 million, August 2005.
2. Bank of the West, $6.6 million, April 2007.
3. Indymac Bank, $7.1 million, July 2007.[6]

---

[6] Pursuant to Fed. R. Evid. 201, the court takes judicial notice of the complaints in these suits. Intervest submitted a request for judicial notice of the Umpqua and Indymac complaints in connection with Intervest's initial motion; Intervest sought

17

As to the Umpqua and Indymac suits, Intervest has provided verified complaints including copies of the respective guaranty agreements, and Kip Skidmore's verified answers to those complaints indicated that the attached copies of the guaranty agreements were true and accurate. The court need not decide whether judicial notice of the statements made in these answers is appropriate, as Skidmores do not dispute that Kip Skidmore entered into these agreements. Although Intervest has provided evidence indicating that these guaranties exist and that the obligees are seeking to enforce them, no evidence indicates the likely success of these suits.[7]

The existence of these guaranties further demonstrates that Skidmores were engaged in the business of, inter alia, guaranteeing loans. At the time of the transfer, Skidmores had guaranteed loans worth $22.7 million. After the transfer, Skidmores had assets, as defined by the UFTA, of $15.6 million, and Skidmores should have expected at least some future decline in the value of these assets. As explained above, for purposes of the UFTA, when a debtor is

---

judicial notice of the other complaint in connection with Intervest's reply. Although Intervest's opening memorandum specifically discussed two of these guaranties and alluded to others, Skidmores have not provided any discussion or even acknowledgment of these guaranties in any of their filings in this case.

[7] These other disputed guaranties are "debts" within the meaning of the UFTA. Because a guaranty is an obligation to pay a claim contingent on the default on the loan, and because the UFTA defines "debts" to include debts that are not yet due, as well as disputed claims, these disputed guaranties are "debts." Thus, it appears that after the transfer, Skidmores' "debts" were greater than their assets, such that the Skidmores were insolvent for purposes of the UFTA.

insolvent because his potential debts exceed his assets, this does not render the debtor's assets per se unreasonably small in light of the business giving rise to those potential obligations. However, in this case, the insolvency is unreasonable. The guarantees are not a type of debt which Skidmores could justifiably expect to satisfy over a period of time with their future earnings. Each is instead a contingent promise to immediately pay an obligation in full. Although the court expresses no opinion as to whether Skidmores should actually pay out on these other guaranties, there is no material question as to whether Skidmores' assets after the transfer were unreasonably small in light of their promises to be able to pay obligations whose value was nearly 50 percent greater than Skidmores' remaining assets. This unreasonableness is further demonstrated by the fact that at least with respect to the Intervest guaranty, Skidmores should have been aware of some facts indicating that they would actually need to pay on this guaranty. Accordingly, Intervest's motion for summary judgment as to the fraudulent transfer claim is granted.

### IV. CONCLUSION

For the reasons stated above, Intervest's motion for partial summary judgment on the breach of guaranty and fraudulent transfer claims, Doc. No. 109, is GRANTED.

IT IS SO ORDERED.

DATED: June 2, 2009.

LAWRENCE K. KARLTON
SENIOR JUDGE
UNITED STATES DISTRICT COURT

19